# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| **UNITED STATES COMMODITY FUTURES TRADING COMMISSION,** | 12CV7127 |
| **Plaintiff,** | JUDGE DER-YEGHIAYAN |
| **v.** | MAG. JUDGE KIM |
| **NIKOLAI SIMON BATTOO; BC CAPITAL GROUP S.A.; BC CAPITAL GROUP INTERNATIONAL LIMITED a/k/a BC CAPITAL GROUP LIMITED a/k/a BC CAPITAL GROUP GLOBAL; BC CAPITAL MANAGEMENT LLP; AND BC CAPITAL GROUP HOLDINGS S.A.,** | COMPLAINT FOR PERMANENT INJUNCTION, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF |
| **Defendants.** | |

**FILED**

SEP X 6 2012

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

Plaintiff, the United States Commodity Futures Trading Commission ("Commission" or "CFTC"), by its attorneys, alleges as follows:

## I.    SUMMARY

1.    From at least 2003 to the present, BC Capital Group S.A. ("BC Panama"), BC Capital Group International Limited (a/k/a BC Capital Group Limited; a/k/a BC Capital Group Global) ("BC Hong Kong"), BC Capital Management LLP ("BC London"), and BC Capital Group Holdings S.A. ("BC Switzerland") operated as a common enterprise (the "BC Common Enterprise").  From at least 2003 to the present, the BC Common Enterprise, by and through its agents, employees and principals, including but not limited to Nikolai Simon Battoo ("Battoo"), and Battoo directly, solicited United States residents and others ("pool participants") to invest in a series of offshore commodity pools under the trade names Private International Wealth Management and Private International Wealth Management – Insurance (collectively the "PIWM

Portfolios"). Battoo and the BC Common Enterprise (collectively, "Defendants") told pool participants that the PIWM Portfolios would engage in trading of futures contracts ("futures") and equities, along with other investment strategies. At least 250 pool participants located in the United States invested at least $140 million in the PIWM Portfolios since 2003.

2.      Defendants invested a large portion of the PIWM Portfolios into hedge funds that Battoo operated, which themselves traded extensively in futures, options on futures, and equities. As losses mounted in the PIWM Portfolios in late 2008, Defendants began a four-year series of misrepresentations and omissions to hide these losses and avoid returning funds to pool participants. Defendants made misrepresentations through periodic account statements, documents purporting to show the value of investments held by the PIWM Portfolios, telephone calls with pool participants, presentations at conferences in the United States and offshore discussing the PIWM Portfolios, and in letters Battoo sent to pool participants about the PIWM Portfolios.

3.      By virtue of this conduct and the further conduct described herein, Defendants have engaged, are engaging, or are about to engage in acts and practices in violation of Sections 4b(a)(1)(A)-(C), 4o, and 4c(b) of the Commodity Exchange Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6o, and 6c(b) (2006 and Supp. III 2009) (the "Act"), and CFTC Regulations ("Regulations") 33.10(a)-(c), 17 C.F.R. §§ 33.10(a)-(c) (2012).[1]

---

[1]      All Sections of the Act that have been amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"), Pub. L. No. 111-203, Title VII (the Wall Street Transparency and Accountability Act of 2010), §§ 701-774, 124 Stat. 1376 (enacted July 21, 2010), will read as follows: "Section x of the Act, as amended, to be codified at 7 U.S.C. § x." All citations to the Act as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC Reauthorization Act of 2008 (the "CRA")), § 13102-13204, 122 Stat. 1651 (enacted June 18, 2008), but not by the Dodd-Frank Act, will read as follows: "Section x of the Act, 7 U.S.C. § x (Supp. III 2009)." All Sections of the Act that were not amended by the CRA will read as follows: "Section x of the Act, 7 U.S.C. § x (2006)."

4.      Battoo is liable under Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006), as a controlling person of the BC Common Enterprise for its violations of the Act and the Regulations because he did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations.

5.      Battoo committed the acts and omissions described herein within the course and scope of his employment or agency at the BC Common Enterprise. Therefore, the BC Common Enterprise is liable under Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), as principals for its agent's acts constituting violations of the Act and Regulations.

6.      Accordingly, pursuant to Section 6c of the Act, as amended, to be codified at 7 U.S.C. §§ 13a-1, the Commission brings this action to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act, the Act, as amended, and the Regulations. In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

7.      Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

## II.      JURISDICTION AND VENUE

8.      The Act, the Act, as amended, and the Regulations together establish a comprehensive system for regulating the purchase and sale of futures and options. The Court has jurisdiction over this action pursuant to Section 6c of the Act, as amended, to be codified at 7 U.S.C. § 13a-1, which authorizes the Commission to seek injunctive relief against any person

whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act, the Act, as amended, or any rule, regulation, or order thereunder.

9.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, as amended, to be codified at 7 U.S.C. § 13a-1(e), in that Defendants transact business in this District, and the acts and practices in violation of the Act and the Regulations have occurred, are occurring, or are about to occur within this district, among other places.

### III.     PARTIES

10.     **United States Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act, the Act, as amended, and the Regulations promulgated thereunder. The CFTC maintains its principal office at Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

11.     **Nikolai Simon Battoo** is an individual who, upon information and belief, currently resides in Switzerland. Until approximately 2007, Battoo was a resident of Florida. Battoo is a principal of a Commission-registered commodity pool operator ("CPO") and commodity trading advisor ("CTA") located in Lincoln, Nebraska.

12.     **BC Capital Group S.A.** is incorporated under the laws of the Republic of Panama. BC Panama is the "manager and managing company" of the PIWM Portfolios. BC Panama has never been registered in any capacity with the Commission.

13.     **BC Capital Group Limited** is incorporated under the laws of Hong Kong. BC Hong Kong is the "appointed financial investment advisor" for the PIWM Portfolios. BC Hong Kong has never been registered in any capacity with the Commission.

14.     **BC Capital Management LLP** is incorporated under the laws of the United Kingdom and registered with the U.K. Financial Services Authority.  BC London is an affiliated company to BC Hong Kong and provides research and development for the PIWM Portfolios under contract to BC Hong Kong.  BC London has never been registered in any capacity with the Commission.

15.     **BC Capital Group Holdings S.A.** is incorporated under the laws of Switzerland.  BC Switzerland is an affiliated company to BC Hong Kong and provides research, trading and execution for the PIWM Portfolios under contract to BC Hong Kong.  BC Switzerland has never been registered in any capacity with the Commission.

## IV.     FACTS

16.     From at least January 2003 to the present, the BC Common Enterprise, by and through its agents, employees and principals including but not limited to Battoo, and Battoo directly, solicited pool participants, both residents of the United States and other countries, to invest in the PIWM Portfolios.  Solicitation materials provided by Defendants to prospective pool participants stated that the PIWM Portfolios would engage in the trading of commodities, financial futures, and equities, along with other investment strategies.  Based on these solicitations, at least 250 U.S. pool participants invested at least $140 million into the PIWM Portfolios.

17.     In 2008, investments made by the PIWM Portfolios into various funds for which Battoo acted as investment advisor suffered significant losses.  However, Defendants failed to disclose some losses, while affirmatively misleading pool participants about the extent of other losses.  Defendants made further misrepresentations to pool participants between 2009 and 2011

about the value of the PIWM Portfolios' underlying investments and the location of the pools'
funds.

### A.     Structure of the BC Common Enterprise

18.     Battoo controlled each entity comprising the BC Common Enterprise and
operated them as a common enterprise in connection with the PIWM Portfolios.  While each
entity purportedly performed different functions in operating the PIWM Portfolios, Defendants
did not differentiate between the various corporations in solicitation materials or in
communications with pool participants.  Instead, some corporations were mere shells with no
actual offices.  All actual operations of the BC Common Enterprise occurred at Battoo's office in
London and his home office in Switzerland.

19.     BC Panama purports to be the "manager and managing company" of the PIWM
Portfolios.  Battoo is identified as the contact person for BC Panama in the 2009 due diligence
questionnaire ("DDQ") that Defendants prepared and provided to pool participants.

20.     BC Hong Kong purports to be the "appointed financial investment advisor" to BC
Panama.  BC Panama and BC Hong Kong are "responsible for the customization and
implementation (investment management) of the custom tailored PIWM portfolio strategies for
each mandate."  Battoo is identified as the principal of and contact for BC Hong Kong in the
2009 DDQ.

21.     BC Panama and BC Hong Kong are both shell companies.  Battoo subleased a
section of office space from Alliance Investment Management ("Alliance"), a Bahamas
registered broker-dealer, to use as BC Panama's and BC Hong Kong's "office."  Battoo and
other employees, agents and principals of the BC Common Enterprise would occasionally use
Alliance's office for meetings with pool participants and investment advisors.  However, no

employee, agent or principal of the BC Common Enterprise operated from Alliance's offices on a full-time basis. Instead, Alliance staff would receive mail and forward it unopened to Battoo. BC Panama and BC Hong Kong shared telephone and facsimile numbers with Alliance.

22. BC London is an affiliated company to BC Hong Kong and purports to provide research and development for the PIWM Portfolios under contract to BC Hong Kong. Battoo operated approximately half of the time out of the BC London office and used that office to meet with at least two U.S.-based investment advisors as part of his solicitation for investments in the PIWM Portfolios. Battoo hired BC London's manager and supervised BC London's manager as a member of the PIWM Portfolios' "Investment Advisory Board."

23. BC Switzerland is an affiliated company to BC Hong Kong and purports to provide research and development, along with trading and execution, under contract to BC Hong Kong. Battoo alternates between BC London's office and BC Switzerland's office, which upon information and belief, is located in Battoo's residence. Battoo used BC Switzerland's office to call investment advisors in the United States about the status of redemption requests made by U.S. pool participants. Battoo is identified as the only contact person for BC Switzerland. The telephone number for BC Switzerland provided in the 2009 DDQ is the same as for Alliance, BC Panama, and BC Hong Kong.

24. Solicitation materials that Defendants provided to prospective pool participants did not distinguish between the different entities comprising the BC Common Enterprise. For example, the DDQ identifies "BC Capital Group" as the PIWM Portfolios' "Global Overseer" and lists offices in the Bahamas, Hong Kong, London, Panama, Singapore, and Switzerland. According to the organizational charts, all entities comprising the BC Common Enterprise share the same "Pofessional [*sic*] Executive Board" and "Investment Advisory Board," with Battoo as

Senior Advisor to the Investment Advisory Board. Battoo did not identify on behalf of which entity comprising the BC Common Enterprise he was acting when communicating with pool participants. Instead, account statements and letters to pool participants were written on "PIWM" and "PIWM-I" letterhead.

### B.  Defendants Solicitation of Pool Participants

25.     The BC Common Enterprise, while acting as a CPO, and Battoo, while acting as an Associated Person ("AP") of a CPO, solicited pool participants, both directly and by soliciting U.S.-based investment advisors to recommend investments by their clients, at offshore conferences hosted by investment advisors between at least 2006 and 2010. Battoo, along with other agents or employees of the BC Common Enterprise, made presentations at the conferences about the PIWM Portfolios. Defendants provided prospective pool participants with copies of the DDQs and Power Point presentations describing the investment strategies used for the PIWM Portfolios. Defendants also provided prospective pool participants with one-page documents on PIWM letterhead that showed the purported monthly returns of the PIWM Portfolios since at least 2001 along with information on the underlying investments held by the portfolios (the "Tear Sheets").

26.     Defendants told prospective pool participants that a portion of the PIWM Portfolios would be used for futures trading. The DDQs identified "Financial Futures" and "Commodities" as part of the "Underlying Investments" made by the PIWM Portfolios. Moreover, the Tear Sheets given to pool participants indicated that a portion of the PIWM Portfolios is invested in "Multi-Strategy Futures & Commodities." The DDQs represented that Battoo is the registered principal of a CTA registered with the National Futures Association ("NFA") in the United States. The DDQs also stated that BC Hong Kong is affiliated with a

registered CTA located in Singapore. The Power Point presentations touted that Battoo is an "accomplished financial trader" with over fifteen years' experience specializing in the futures and commodities markets.

27.     Since at least January 2003, pool participants sent funds, directly or through offshore companies with the intent of investing in the PIWM Portfolios, to an account in the name of BC Panama at Alliance. Alliance told at least some pool participants that pool participants shared all profits or losses of the PIWM Portfolio in which they invested on a *pro rata* basis. Defendants established at least eleven PIWM Portfolios in which U.S. pool participants invested funds (the "U.S. Participant Pools").

28.     Defendants told pool participants that the PIWM Portfolios contained $1.5 billion as of May 2012, down from $2.2 billion in March 2009. Defendants told pool participants that there were 68 separate PIWM Portfolios as of March 2009.

### C.     Investments and Trading on Behalf of PIWM Portfolios

29.     The PIWM Portfolios functioned as a fund of funds, whereby Defendants invested pool participant funds into a variety of other hedge funds. Defendants told pool participants that the PIWM Portfolios would pursue several different strategies to generate returns, including futures trading. While each PIWM Portfolio held slightly different combinations of funds, the underlying investments of each portfolio fall into three general categories: (a) hedge funds for which Battoo acted as investment advisor; (b) hedge funds and commodity pools operated by third parties; and (c) "Managed Accounts."

30.     Defendants told pool participants that a portion of the PIWM Portfolios was invested with five hedge funds for which Battoo acted as investment advisor: (a) FuturesOne Diversified Fund ("F1 Diversified"); (b) FuturesOne Innovative Fund ("F1 Innovative"); (c)

Anchor Hedge Fund ("Anchor Fund"); (d) Galaxy Fund; and (e) Two Oceans Fund
(collectively, the "Battoo-Operated Funds"). Each Battoo-Operated Fund contained multiple
"share classes" in which the PIWM Portfolios invested. Several share classes of F1 Diversified
held trading accounts at futures commission merchants ("FCMs") in the United States and
actively traded futures and options on futures contracts on U.S. exchanges.

31.     Defendants told pool participants that a portion of the PIWM Portfolios was also
invested in various hedge funds operated by entities unaffiliated with Battoo. These investments
included some of the largest global hedge funds, as well as commodity pools run by at least four
third-party CPOs. At least three of these third-party CPOs are located in the United States.

32.     Finally, Defendants told pool participants that Defendants traded a portion of the
PIWM Portfolios in six "Managed Accounts" held at Alliance. One "Managed Account" was
termed "Multi-Strategy Futures & Commodities." Defendants told pool participants in the U.S.
Participant Pools that up to 18.79% of their portfolios' funds were in the "Multi-Strategy Futures
& Commodities" managed account.

### D.     Undisclosed Losses and Misrepresentations in 2008

#### 1.     The 2008 Trading Losses and Failure to Disclose: October to December 2008

33.     Between April 2008 and October 2008, the PIWM Portfolios suffered significant
losses, potentially as high as $140 million, that Defendants failed to disclose to pool participants.
As of December 31, 2008, the PIWM Portfolios held significant investments in six share classes
of the Anchor Fund, Galaxy Fund, and F1 Diversified Fund ("Phi R2 share classes"). Between
April 2008 and October 2008, the Phi R2 share classes suffered significant losses from trading
on a London-based investment platform (the "Phi R2 Fund losses"). Because of the Phi R2 Fund
losses, the Anchor Fund, Galaxy Fund, and F1 Diversified Fund suspended redemptions of the
Phi R2 share classes between October 13, 2008 and December 18, 2008.

34.     Battoo, as investment advisor to the Anchor Fund, Galaxy Fund, and F1 Diversified Fund, knew or was reckless in not knowing of the Phi R2 Fund losses and the resulting suspensions of redemptions.  Despite this knowledge, Defendants did not inform some PIWM Portfolio pool participants that a significant portion of their portfolios were negatively impacted by the Phi R2 Fund losses and the resulting suspensions of redemptions.  Defendants accepted additional funds from existing pool participants after the PIWM Portfolios suffered the Phi R2 Fund losses without disclosing such losses to pool participants.

**2.     *The Madoff Related Losses and Misrepresentations: December 2008***

35.     Defendants made misrepresentations to pool participants about the PIWM Portfolios' exposure to the Ponzi scheme operated by Bernard Madoff (the "Madoff scheme").

36.     Tear Sheets that Defendants provided to pool participants during sales solicitations, indicated that, as of October 2008, between 7% and 20% of each PIWM Portfolio was invested in certain share classes of the Anchor Fund and Galaxy Fund ("Madoff share classes").  Unknown to pool participants, the Madoff share classes, in turn, ultimately invested in the Madoff scheme.

37.     Between December 18, 2008 and December 22, 2008, after the Madoff scheme was exposed and Madoff was arrested, the Anchor Fund and Galaxy Fund suspended redemptions of the Madoff share classes because of losses sustained in the Madoff scheme.

38.     As the investment manager of the Anchor Fund and Galaxy Fund, Battoo knew or was reckless in not knowing of the funds' suspensions of redemptions.

39.     Despite knowing about the PIWM Portfolios' substantial exposure to the Madoff scheme, on or about December 16, 2008, Battoo sent an email to two investment advisors advising U.S. pool participants that "PIWM-Insurance will be issuing a letter by end of week to

all clients to inform them that the current Madoff situation will have practically no impact to its portfolios."

40.     On or about December 19, 2008, an agent of the BC Common Enterprise operating from Florida sent an email to some U.S. pool participants, attaching a letter from Battoo dated December 19, 2008.  Battoo's letter stated that:

> "PIWM did carry a small nominal percentage of approx (0.20% - 2.9%) portion of **indirect** exposure through a diversified hedge fund.  Thus when accounted for, the impact will be less than (0.05% - 0.78%) depending on each client's custom-tailored portfolio which is very low and well under 1.0%."

41.     Battoo's December 19, 2008 letter misrepresents the PIWM Portfolio pool participants' exposure to the Madoff scheme.

42.     Defendants also failed to disclose losses associated with the Madoff scheme when Battoo discussed the PIWM Portfolios' performance at a conference for current PIWM Portfolio pool participants held in Las Vegas, Nevada, in January 2009.  Defendants accepted additional funds from existing pool participants after the PIWM Portfolios suffered the Madoff scheme losses without disclosing such losses to pool participants.

**E.     Misrepresentations of Value of Underlying Investments and Location of Funds**

43.     Following the undisclosed losses suffered by the PIWM Portfolios in 2008 due to the Phi R2 Fund and the Madoff scheme losses, Defendants made additional misrepresentations to pool participants as to the value of the underlying investments in the PIWM Portfolios and the location of the PIWM Portfolios' assets.  These misrepresentations began as some pool participants were placing additional funds in the PIWM Portfolios and continued as pool participants demanded redemptions starting in 2011.

### 1.    The Fraudulent Asset Verifications: September 2009

44.    In or around September 2009, Defendants provided pool participants in the eleven U.S. Participant Pools with asset verifications conducted by the PIWM Portfolios' third-party administrator ("Asset Verifications"). These eleven Asset Verifications purportedly provided the value of investments made by the PIWM Portfolios as of December 31, 2008. While the Asset Verifications were issued by the third-party administrator, they were based on information provided to the third-party administrator by Defendants. Further, Battoo, not the third-party administrator, sent the Asset Verifications to some if not all pool participants via email.

45.    The Asset Verifications grossly overstate the net asset value of the U.S. Participant Pools' investments with commodity pools operated by four third-party CPOs. The Asset Verifications state that the U.S. Participant Pools had investments worth over $21.8 million with commodity pools operated by these four third-party CPOs. However, the total value of all investments with these third-party CPOs made by any entity associated with Defendants totaled less than $8 million. Further, the Asset Verifications backdated investments in funds operated by two CPOs that occurred after the purported valuation date. At a minimum, the Asset Verifications overstate investments with the four third-party CPOs by $13.9 million.

### 2.    Misrepresentations Regarding Funds Held at MF Global

46.    Beginning in October 2011, Battoo made representations to pool participants that the PIWM Portfolios were significantly impacted by the collapse of MF Global Inc. ("MF Global"), a registered FCM that filed for bankruptcy at the end of October 2011. Citing the MF Global collapse, the BC Common Enterprise suspended valuations and redemptions of PIWM Portfolios on November 11, 2011. In letters sent to pool participants on or about November 11, 2011, Battoo told pool participants that a portion of the PIWM Portfolios' assets were held in

"underlying managed accounts at MF Global, along with CTAs and hedge fund investments that cleared through MF Global." Defendants told pool participants that all PIWM Portfolios were affected. In a subsequent letter sent to pool participants via email on or about December 9, 2011, Battoo stated that, while "each portfolio would have a varying exposure to MF Global[,]" the exposure ranged from 17% to 39% of each portfolio.

47. According to the most recent account statements that Defendants provided to pool participants, the U.S. Participant Pools had a value of at least $130 million. Therefore, at a minimum, the U.S. Participant Pools' exposure to MF Global should be at least $22 million, or 17% of $130 million.

48. Despite Battoo's statements to pool participants, MF Global had no "managed accounts" in the name of PIWM or the PIWM Portfolios. In fact, the only accounts with any connection to Defendants were in the name of the F1 Diversified Fund and held less than $2.7 million in net liquidation value at the time of MF Global's bankruptcy.

49. Battoo has refused to provide regulators with the identity of any "hedge fund investments that clear through MF Global" referenced in Battoo's November 11, 2011 letter.

50. Given the relatively small exposure that the PIWM Portfolios had to the MF Global collapse, Defendants misrepresented to Pool Participants either (a) the value of the PIWM Portfolios or (b) the extent to which the PIWM Portfolios were affected by the MF Global collapse.

## V.   VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### COUNT I

**Violations of Sections 4b(a)(1)(A)-(C) of the Act,**
**7 U.S.C. §§ 6b(a)(1)(A)-(C) (Supp. III 2009)**
**(Fraud in Connection with Futures)**

51.    The allegations set forth in paragraphs 1 through 50 are realleged and incorporated by reference herein.

52.    Sections 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C) (Supp. III 2009), make it unlawful:

> for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person – (A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; (C) willfully to deceive or attempt to deceive the other person by any means whatsoever…

53.    From at least October 2008 to the present, in or in connection with futures contracts made or to be made, for or on behalf of other persons, Battoo and the BC Common Enterprise, by and through its employees, agents and principals including but not limited to Battoo, cheated or defrauded or attempted to cheat or defraud pool participants or prospective pool participants, willfully made or caused to be made to the other person any false report or statement, and  willfully deceived or attempted to deceive pool participants or prospective pool participants by, among other things knowingly making material misrepresentations or omissions and issuing false account statements and reports, as described in paragraphs 1 through 50 above, all in violation of Section 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C) (Supp. III 2009).

54.      Each misrepresentation or omission of material fact and false account statement and report, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C) (Supp. III 2009).

55.      Battoo controlled the BC Common Enterprise, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the BC Common Enterprise's conduct as alleged in this Complaint.  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006), Battoo is liable for the BC Common Enterprise's violations of Section 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C) (Supp. III 2009).

56.      The foregoing acts, misrepresentations, omissions, and failures of Battoo, as well as other employees or agents of the BC Common Enterprise, occurred within the scope of their agency, employment or office with the BC Common Enterprise; therefore, the BC Common Enterprise is liable for these acts pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.2 (2012).

57.      Defendants engaged in the acts and practices described above knowingly or with reckless disregard for the truth.

## COUNT II

### Violations of Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2006)
### (Fraud By Commodity Pool Operators and Associated Persons)

58.      The allegations set forth in paragraphs 1 through 57 are realleged and incorporated herein by reference.

59.      Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2006), prohibits CPOs and associated persons of CPOs from using the mails or any other means of interstate commerce to:

(A) employ any device, scheme, or artifice to defraud any client or
participant or prospective client or participant; or (B) engage in
any transaction, practice, or course of business which operates as a
fraud or deceit upon any client or participant or prospective client
or participant.

60.     From at least January 2003 to the present, the BC Common Enterprise, by and

through its agents, employees and principals, including but not limited to Battoo, solicited,

accepted and received from others, funds for the purpose of trading commodity interests,

including commodities for future delivery on or subject to the rules of a contract market.

Therefore, the BC Common Enterprise acted as a commodity pool operator for the PIWM

Portfolios under both Section 1(a)(5) of the Act, 7 U.S.C. § 1(a)(5) (2006) (for activity before

July 11, 2011), and under Section 1(a)(11) of the Act, as amended, to be codified at 7 U.S.C. §

1(a)(11) (for activity on or after July 11, 2011).

61.     From at least January 2003 to the present, Battoo acted in a capacity with the BC

Common Enterprise as a partner, officer, employee, consultant, or agent in a capacity which

involves the solicitation of funds, securities or property for participation in the PIWM Portfolios,

and supervision of other persons so engaged.  Therefore, Battoo acted as an associated person of

the BC Common Enterprise under Regulation 1.3(aa)(3), 17 C.F.R. § 1.3(aa)(3) (2012).

62.     From at least October 2008 to the present, Battoo and the BC Common

Enterprise, by and through its employees, agents and principals including but not limited to

Battoo, employed a device, scheme or artifice to defraud pool participants and prospective pool

participants or engaged in a transaction, practice or course of business, which operated as a fraud

or deceit upon commodity futures and options pool participants in violation of Section 4o(1) of

the Act, 7 U.S.C. § 6o(1) (2006), by, among other things, knowingly making material

misrepresentations or omissions and issuing false account statements and reports, as described in

paragraphs 1 through 57 above. Battoo and the BC Common Enterprise used means of interstate commerce, including but not limited to telephone calls, emails, and bank wire transfers, in the conduct of their fraudulent scheme.

63.     Each misrepresentation or omission of material fact, issuance of false statement or report, actual or attempted to cheat, defraud, or deceive, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2006).

64.     Battoo controlled the BC Common Enterprise, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the BC Common Enterprise's conduct alleged in this Complaint. Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006), Battoo is liable for the BC Common Enterprise's violations of Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2006).

65.     The foregoing acts, misrepresentations, omissions, and failures of Battoo, as well as other employees or agents of the BC Common Enterprise, occurred within the scope of their agency, employment or office with the BC Common Enterprise; therefore, the BC Common Enterprise is liable for these acts pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.2 (2012).

66.     Defendants engaged in the acts and practices described above knowingly or with reckless disregard for the truth.

## COUNT III

### Violations of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2006), and Regulations 33.10(a)-(c), 17 C.F.R. §§ 33.10(a)-(c) (2012) (Fraud in Connection with Options Trading)

67.     The allegations set forth in paragraphs 1 through 66 are realleged and incorporated herein by reference.

68.     Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2006), provides that no person shall engage in any commodity option transaction regulated under the Act contrary to any rule, regulation, or order of the Commission.  Furthermore, Regulations 33.10(a)-(c), 17 C.F.R. §§ 33.10(a)-(c) (2012), make it unlawful for any person, directly or indirectly:

> (a) To cheat or defraud or attempt to cheat or defraud any other person; (b) To make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof; (c) To deceive or attempt to deceive any other person by any means whatsoever in or in connection with . . . any commodity option transaction.

69.     From at least October 2008 to the present, in or in connection with commodity options transactions, Battoo and the BC Common Enterprise, by and through its employees, agents and principals including but not limited to Battoo, cheated or defrauded or attempted to cheat or defraud pool participants or prospective pool participants, willfully made or caused to be made to the other person any false report or statement and willfully deceived or attempted to deceive pool participants or prospective pool participants by, among other things knowingly making misrepresentations or omissions and issuing false account statements and reports, as described in paragraphs 1 through 66 above, all in violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2006), and Regulations 33.10(a)-(c), 17 C.F.R. § 33.10(a)-(c) (2012).

70.     Each misrepresentation or omission of material fact and false account statement, including but not limited to those specifically alleged herein, is alleged as a separate and distinct

violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2006), and Regulations 33.10(a)-(c), 17 C.F.R. §§ 33.10(a)-(c) (2012).

71.     Battoo controlled the BC Common Enterprise, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the BC Common Enterprise's conduct alleged in this Complaint. Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006), Battoo is liable for the BC Common Enterprise's violations of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2006) and Regulations 33.10(a)-(c), 17 C.F.R. §§ 33.10(a)-(c) (2012).

72.     The foregoing acts, misrepresentations, omissions, and failures of Battoo, as well as other employees, agents and principals of the BC Common Enterprise, occurred within the scope of their agency, employment or office with the BC Common Enterprise; therefore, the BC Common Enterprise is liable for these acts pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.2 (2012).

73.     Defendants engaged in the acts and practices described above knowingly or with reckless disregard for the truth.

## VI.     **RELIEF REQUESTED**

WHEREFORE, the CFTC respectfully requests that the Court, as authorized by Section 6c of the Act, as amended, to be codified at 7 U.S.C. § 13a-1, and pursuant to its own equitable powers, enter:

74.     An order finding that Defendants violated Sections 4b(a)(1)(A)-(C), 4o(1) and 4c(b) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6o(1) and 6c(b) (2006 and Supp. III 2009); and Regulations 33.10(a)-(c), 17 C.F.R. §§ 33.10(a)-(c) (2012).

75.     An order of permanent injunction prohibiting Defendants and any of their agents, servants, employees, assigns, attorneys, and persons in active concert or participation with any

Defendant, including any successor thereof, from engaging, directly or indirectly in conduct in violation of Sections 4b(a)(1)(A)-(C), 4o(1) and 4c(b) of the Act, as amended, to be codified at 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6o(1) and 6c(b); and Regulations 33.10(a)-(c), 17 C.F.R. §§ 33.10(a)-(c) (2012).

76.     An order of permanent injunction prohibiting Defendants and any of their agents, servants, employees, assigns, attorneys, and persons in active concert or participation with any Defendant, including any successor thereof, from engaging, directly or indirectly, in:

(i)     trading on or subject to the rules of any registered entity (as that term is defined in Section la of the Act, as amended, to be codified at 7 U.S.C. § la);

(ii)     entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 1.3(hh), 17 C.F.R. § 1.3(hh) (2012)) ("commodity options"), securities futures products, and/or foreign currency ("forex contracts") (as described in Section 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, 7 U.S.C. § 2(c)(2)(B) and 2(c)(2)(C)(i) (2006 and Supp. III 2009)), for their own personal or proprietary account or for any account in which they have a direct or indirect interests;

(iii)     having any commodity futures, options on commodity futures, commodity options, security futures products, and/or forex contracts traded on any of their behalf;

(iv)     controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, security futures products and/or forex contracts;

(v)     soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, security futures products, and/or forex contracts;

(vi)     applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2012); and

(vii)     acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2012)), agent or any other officer or employee of any person (as that term is defined in Section 1a of the Act, as amended, to be codified at 7 U.S.C. § 1a) registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2012).

77.     An order directing Defendants, as well as any successors thereto, to disgorge, pursuant to such procedure as the Court may order, all benefits received from the acts or practices which constitute violations of the Act, the Act, as amended, and the Regulations as described herein, and pre- and post-judgment interest thereon from the date of such violations.

78.     An order directing Defendants to make full restitution to every person or entity whose funds Defendants received or caused another person or entity to receive as a result of acts and practices that constituted violations of the Act, the Act, as amended, and the Regulations as described herein, and pre- and post-judgment interest thereon from the date of such violations.

79.     An order directing each Defendant to pay a civil monetary penalty under the Act and the Act, as amended, to be assessed by the Court, in amounts of not more than the higher of

(1) triple the monetary gain to Defendant for each violation of the Act the Act, as amended, and the Regulations or (2) $140,000 for each violation of the Act, the Act, as amended, and the Regulations, plus post-judgment interest.

80.    An order directing the Defendants and any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the customers whose funds were received by them as a result of the acts and practices which constituted violations of the Act the Act, as amended, and Regulations, as described herein.

81.    An order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2006).

82.    Such other and further relief as the Court deems proper.

Respectfully submitted,

_____
Andrew Ridenour (D.C. Bar No. 501628)
David S. Slovick (Illinois Bar No. 6257290)
Amanda L. Harding (Illinois Bar No. 6299967)
Kathleen Banar (Illinois Bar No.6200597)
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581
Tel:  (202) 418-5438 (Ridenour)
Tel:  (202) 418-5451 (Slovick)
Tel:  (202) 418-5968 (Harding)
Tel:  (202) 418-5335 (Banar)
Fax:  (202) 418-5937
aridenour@cftc.gov
dslovick@cftc.gov
aharding@cftc.gov
kbanar@cftc.gov

Carlin Metzger (Illinois Bar No. 6275516)
U.S. Commodity Futures Trading Commission
Central Regional Office
525 W. Monroe Street, Suite 1100
Chicago, IL 60614
Tel:  (312) 596-0536
cmetzger@cftc.gov

Dated this 6th day of September, 2012.