# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION, ) ) ) Plaintiff, ) ) v. ) ) NIKOLAI SIMON BATTOO; BC CAPITAL GROUP S.A.; BC CAPITAL GROUP INTERNATIONAL LIMITED a/k/a BC CAPITAL GROUP LIMITED a/k/a BC CAPITAL GROUP GLOBAL; AND BC CAPITAL GROUP HOLDINGS S.A., ) ) ) ) ) ) ) ) Defendants. ) | Case No. 1:12-cv-07127<br><br>Hon. Edmond E. Chang |

## RECEIVER'S MOTION TO APPROVE
## PLAN OF DISTRIBUTION AND TREATMENT OF CLAIMS

Robb Evans & Associates LLC (the "Receiver"), the Court-appointed receiver of Defendants Nikolai Simon Battoo ("Battoo") and the BC Common Enterprise[1] (collectively with Battoo, the "Defendants") hereby moves for an order approving the Receiver's plan to distribute receivership assets to claimants and approving on a final basis the Receiver's proposed treatment of claims (the "Distribution Motion"). In further support of its Distribution Motion, the Receiver states as follows:

---

[1] As defined in the Preliminary Injunction, the "BC Common Enterprise" consists of BC Capital Group S.A., BC Capital Group International Limited a/k/a BC Capital Group Limited a/k/a BC Capital Group Global, and BC Capital Group Holdings S.A.

# BACKGROUND

I. **THE COURT APPOINTED THE RECEIVER TO MARSHALL INVESTOR ASSETS UNDER THE DEFENDANTS' CONTROL.**

In September 2012, the United States Commodity Futures Trading Commission ("CFTC") initiated this action against Nikolai Battoo and the BC Common Enterprise alleging multiple violations of the U.S. Commodity Exchange Act and associated regulations. (Compl. [Dkt. #1].) At the same time, the CFTC sought a preliminary injunction and the appointment of a receiver to freeze and marshal what remained of investor assets under Defendants' control. Granting the CFTC's motion, the Court appointed Robb Evans & Associates LLC as Receiver "with the full powers of an equity receiver, over Defendants and their affiliates and subsidiaries." Prelim. Inj. [Dkt. #22] ¶ 41.) By the terms of the Court's order, the receivership encompassed:

> [A]ll the funds, properties, premises, accounts, businesses, partnerships, sole proprietorships and any other kinds of assets directly or indirectly owned, beneficially or otherwise, managed or controlled by the Defendants, whether held in their own names or in the names of others.

(*Id.* (defining "Receivership Assets").) The Court directed the Receiver, among other things, to assume full control over the Receivership Assets by removing Defendants and anyone acting on their behalf from control and management of the Defendants' affairs. (*Id.* ¶ 41.A.) Further, the Court directed the Receiver to take custody of all Receivership Assets together with the other funds and assets under the Defendants' control. (*Id.* ¶ 41.B.)

The Receiver has previously reported on its activities, including the results of its extensive forensic accounting analysis of Defendants' financial records, in the following reports and associated exhibits:

- First Report of Activities for September 27, 2012 through January 17, 2013 on January 18, 2013 [Dkt. No. 51];

2

- Receiver's Modified Report of Activities for January 18, 2013 through November 22, 2013 [Dkt. No. 217] ("Receiver's Second Report"); and

- Affidavit of Brick Kane, Exhibit A to the Plaintiff's Statement of Undisputed Material Facts [Dkt. No. 273] ("B. Kane Affidavit").

Although a full recitation of those findings is beyond the scope of this Distribution Motion, the Receiver relies on the analysis set forth in those reports to inform its recommendations here.

## II. FOLLOWING ITS INVESTIGATION, THE RECEIVER CONCLUDED THAT BATTOO OPERATED THE BC COMMON ENTERPRISE AS A "PONZI-TYPE" SCHEME.

Based on its forensic accounting analysis of more than 15,000 pages of bank records, cash reconciliation reports, and other financial records relating to the Defendants, the Receiver determined that Battoo operated the BC Common Enterprise as "a Ponzi-type fraudulent common enterprise." (Receiver's 2d Report [Dkt. #217] at 68; *see also* B. Kane Aff. '[Dkt. #273] ¶ 5.) As part of his scheme, Battoo solicited investor funds either: (a) through offshore managed accounts operated under the trade names Private International Wealth Management ("PIWM") and Private International Wealth Management – Insurance ("PIWM-I") (collectively, the "PIWM Portfolios"), or (b) directly into hedge funds formed in the British Virgin Islands ("BVI"). Whatever point investor funds entered the BC Common Enterprise, Battoo caused such funds to be extensively commingled with other investors' funds, routinely transferring funds among the various accounts that Battoo controlled. Exercising complete control over the investing and financing activities of the funds, Battoo operated them "as one investment pool on a commingled basis." (Receiver's 2d Report [Dkt. #217] at 68.)

### A. Battoo exercised exclusive control over the PIWM Portfolios.

As part of his scheme, Battoo encouraged some investors to place their money in the PIWM Portfolios. In materials provided to investors, Battoo characterized the PIWM Portfolios as "international wealth management concept[s] that [are] active in <u>wealth structuring</u> and <u>active</u>

3

wealth management." (B. Kane Decl. Ex. 9 [Dkt. #273-9] at 5 (emphasis in original).) Battoo advertised PIWM as a "full service boutique international wealth management organization." Notwithstanding the jargon Battoo used, the PIWM Portfolios were not separate legal entities existing anywhere but were instead the umbrella names Battoo gave to the activities performed by various companies that he controlled.

Battoo operated and controlled the PIWM Portfolios through a series of shell companies, including the receivership entities comprising the BC Common Enterprise described in the CFTC's complaint. Specifically, BC Capital Group S.A. ("BCCG") and BC Capital International S.A. ("BCCG-I") served as the "manager and managing company" of PIWM and PIWM-I, respectively. (B. Kane Aff. ¶ 9; *id.* Ex. 9 at 4 (discussing BCCG) and Ex. 10 at 14 (discussing BCCG-I).) BC Capital Group Limited (Hong Kong) in turn served as the "appointed financial investment advisor" to those managing companies. (*Id.* Ex. 9 [Dkt. 273-9] at 5.) Together those entities purportedly were, in Battoo's words, "responsible for the customization and implementation (investment management) of the custom tailored PIWM portfolio strategies for each mandate." (*Id.* Ex. 9 [Dkt. #273-9] at 5.)

While the ownership structure that Battoo touted in marketing materials to investors gave the impression of a large sophisticated international organization, in truth, these entities were mere shell companies with no permanent employees. Battoo himself was behind each of the companies purportedly managing the PIWM Portfolios. Battoo wholly owned and controlled all shares of BCCG and BCCG-I. (*See id.* Ex. 8 [Dkt. 273-8] at 14 ("All of the shares in the [BC Capital] are held by Mr. Nikolai S. Battoo ('Battoo') pursuant to a Power of Attorney dated 4th March 2010."); Ex. 10 [Dkt. 273-10] at 14 (same with respect to BCCG-I).) Battoo also owned

4

nearly all (90%) of BC Capital (Hong Kong) through another entity called Dreamlink Global Holdings II S.A (itself wholly-owned by Battoo).[2]

In addition to wholly owning the entities that controlled the PIWM Portfolios, Battoo personally controlled and directed the funds in the portfolios. Again, in due diligence materials provided to investors, he described himself as the "senior advisor" responsible for directing the "active wealth management" services that the PIWM Portfolios purportedly offered investors. (*Id.* Ex. 8 at 14 ("[BCCG] was formed primarily to manage [PIWM], a global wealth management concept that provided wealth structuring and active wealth management under the direction of, among others, Battoo, who was the organizations' senior advisor."); *Id.* Ex. 10 at 14 (same with respect to BCCG-I / PIWM-I).) In fact, he was the sole decision maker that personally authorized and directed the movement of funds placed in the PIWM Portfolios.

Battoo, through the BC Common Enterprise entities, contracted with Alliance Investment Management Limited ("Alliance"), a Bahamian registered Class One Broker Dealer regulated by the Securities Commission of The Bahamas, to serve as the custodian of the funds that investors entrusted to the PIWM Portfolios. Rather than maintaining separate accounts for each investor, Battoo caused all investor funds to be placed into one of two omnibus bank accounts held in Alliance's name at either First Caribbean International Bank or Royal Bank of Canada both located in Nassau, Bahamas.

Alliance maintained separate ledgers for each of the PIWM Portfolios. Many of the PIWM investors were institutional investors in turn representing numerous individuals who were the true beneficial owners of such investments. In addition to the investor ledgers, the Receiver

---

[2] Andrew Keuls, a long-time business associated of Battoo, owned the remaining 10% interest in BC Capital (Hong Kong).

also discovered that Alliance also maintained five other ledgers either in Battoo's name or under his control through which Battoo misappropriated investor funds for his own personal use. Examining those ledgers, the Receiver concluded that Battoo stole approximately $46.7 million of PIWM Portfolio investor funds for his own use. (Receiver's 2d Report [Dkt. #217] at 30.)

### B. Battoo also exclusively controlled the BVI Funds.

In addition to the PIWM Portfolios, Battoo also controlled certain offshore hedge fund (and numerous subfunds), formed in the British Virgin Islands ("BVI"), including FuturesOne Diversified Fund; (b) FuturesOne Innovative Fund; (c) Anchor Hedge Fund; (d) Galaxy Fund; and (e) Two Oceans Fund (collectively, the "BVI Funds"). Similar to his control of the PIWM Portfolios, Battoo exercised control over the BVI Funds nominally through other entities, including Defendant BC Capital Group International Limited ("BC Hong Kong") that he either directly or indirectly owned. (*See* B. Kane Aff. ¶¶51-55 (describing Battoo's control of BVI Funds).) Battoo maintained over 40 bank and investment accounts in the name of the BVI Funds at EFG Private Bank (Channel Islands) Ltd. located in the Bailiwick of Guernsey. Based on its review and analysis of EFG bank records, the Receiver reconstructed and prepared an accounting of cash receipts and disbursements for the relevant EFG accounts for the period August 23, 2006 to September 13, 2012.

### C. Exercising his control over the PIWM Portfolios and BVI Funds, Battoo regularly commingled funds among such accounts to conceal investment losses and otherwise perpetuate his scheme.

The Receiver conducted an extensive forensic accounting of more than 120 bank and investor portfolio accounts under the control of or affiliated with Defendants, including the PIWM Portfolio ledgers held by Alliance and EFG accounts held under in the name of the BVI Funds. (B. Kane Aff. [Dkt. #273] ¶ 5.c.) Based on that analysis, the Receiver concluded that

Battoo had solicited at least $340 million from more than 800 investors: some investors directed their investment into the PIWM Portfolios while other investors purported to invest directly in the BVI Funds. (*Id.* ¶ 20.) With respect to investors who were nominally investing assets in the PIWM Portfolios, Battoo caused those investors' funds to be deposited in one of Alliance's bank accounts where such funds were commingled with other investor funds. Once commingled, Battoo then transferred such funds either (a) to EFG accounts held in the BVI Funds' name; (b) to other third-party investments; or (c) to still other Battoo-controlled accounts for his personal use. As to funds either directly invested in the BVI Funds or transferred to the BVI Funds from the Alliance accounts, Battoo similarly transferred such funds to either (w) other accounts held in the BVI Funds' name at EFG, (x) third-party investments or hedge funds; (y) other investors on behalf of different BVI Funds, or (z) to Battoo's account at Folio Administrators Ltd. ("Folio"). (*See id*. ¶¶ 23, 42, 64-66.)

Despite sustaining substantial financial losses, including his own misappropriation of investor funds for personal use, Battoo sought to perpetuate his scheme by misrepresenting the investment performance of the PIWM Portfolios and BVI Funds to investors. (*See, e.g.,* Receiver's 2d Report [Dkt. #217] at 56-59 (regarding PIWM Portfolios); B. Kane Decl. ¶¶ 24-31 (regarding BVI Fund performance).) When investors sought to redeem their purportedly profitable investments, Battoo would transfer funds among accounts as necessary to pay the redemption. Thus, rather than paying redemptions from investment gains, Battoo was effectively using funds from new investors to pay returns to earlier investors – one of the classic characteristics of a traditional Ponzi scheme. Given such extensive commingling of investor funds, the Receiver concludes that, even if possible, attempting to trace recovered assets to

7

specific investors would ignore the reality of how Battoo actually operated the BC Common Enterprise.

### III. THE RECEIVER FACED CHALLENGES TO ITS EFFORTS TO MARSHALL THE DEFENDANTS' ASSETS FROM LIQUIDATORS APPOINTED IN FOREIGN JURISDICTIONS WHERE BATTOO ORGANIZED THE BC COMMON ENTERPRISE ENTITIES.

As part of its efforts to assume control over the foreign BC Common Enterprise entities, marshal their assets, and obtain relevant records, the Receiver sought official status in various countries, including Hong Kong, Monaco, Anguilla, and the Bahamas. Specifically, to assume control over BCCG and BCCG-I (collectively, the "BCCG Entities"), the Receiver had the Bahamas Supreme Court appoint it, together with two insolvency practitioners from PricewaterhouseCoopers Advisory (Bahamas) Ltd. ("PwC"), to serve as Joint Official Liquidators ("JOLs"). The Receiver's appointment as JOL with PwC was the result of a compromise with various creditors of the BCCG Entities who had been simultaneously seeking the appointment of another firm to serve as the official liquidator. Had another firm been appointed, the Receiver may have faced further resistance to asserting control over the BCCG Entities and their records.

Around this time, the Receiver also learned that Battoo and his surrogates had sought to place some of the entities he controlled, including the BVI Funds, into foreign liquidation proceedings thereby interfering with the Receiver's efforts to assume control over them. In the case of the BVI Funds, local BVI insolvency professionals (the "BVI Liquidators") were appointed as liquidators subject to the supervision of the BVI Courts. Shortly thereafter, the BVI Liquidators began to actively challenge the Receiver's claims to assets held in the name of the BVI Funds, including both the foreign assets held in the EFG accounts and assets that the Receiver had already seized in the U.S. With respect to the EFG accounts, the Receiver (in its

role as one of the JOLs) and the BVI Liquidators became competing parties in interest in an interpleader action filed in Guernsey courts by EFG. While the analysis performed by the JOLs in connection with that proceedings aided the Receiver's efforts to untangle the BC Common Enterprise's financial condition, the Receiver was ultimately unsuccessful in that suit due in part to mounting legal expenses that threatened to substantially erode the estate without clear assurances of a successful outcome. Having been unsuccessful in the Guernsey Action, the receivership estate also faced potentially substantial costs award in favor of the BVI Liquidators permitted under Guernsey law that may have further depleted the receivership estate.

In addition to the interpleader action in Guernsey, the BVI Liquidators had also taken an active role in this case contending that they had a superior right to substantially all of the assets held by the Receiver in this action. Ultimately, after years of contentious litigation eroding investor assets, the BVI Liquidators and the Receiver ultimately agreed to settle all disputes between them. Both the BVI Court and this Court approved the terms of the resulting settlement agreement (the "Final Settlement Agreement") without objection by any party in interest after the Receiver provided wide-ranging notice to all interested parties and claimants. Under the terms of the Final Settlement Agreement, the Receiver agreed to transfer $9 million of the disputed assets in its possession to the BVI Liquidators. The Final Settlement Agreement also provided that investors who had directly invested in the BVI Funds were precluded from recovering from the receivership estate here unless the Receiver exercised its sole discretion (subject always to the Court's approval) to allow any such claims in the interests of equity.

Having fully implemented the terms of the Final Settlement Agreement, the Receiver now seeks approval of its plan of distribution and treatment of claims as set out below. The Receiver anticipates the once the Court approves such plan, the Receiver will shortly thereafter

be in position to wind-down the receivership, including distributing available receivership assets to approved claimants.

## DISTRIBUTION PLAN

In supervising an equitable receivership, the primary job of the district court is to ensure that the proposed plan of distribution is fair and reasonable." *SEC v. Wealth Mgmt. LLC,* 628 F.3d 323, 332 (7th Cir. 2010). As here, "where investors' assets are commingled and the recoverable assets in a receivership are insufficient to fully repay the investors, 'equality is equity.'" *Id.* at 333 (citing *Cunningham v. Brown*, 265 U.S. 1, 13 (1924).) Thus, courts have routinely approved *pro rata* distribution plans under such circumstances. *Id.* (citing *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88-90 (2d Cir. 2002); *United States v. Durham*, 86 F.3d 70, 72-73 (5th Cir. 1996); *SEC v. Elliott*, 953 F.2d 1560, 1569-70 (11th Cir. 1992); *In re Reserve Fund Secs. & Derivative Litig.*, 673 F. Supp. 2d 182, 195-96 (S.D. N.Y. 2009); *SEC v. Byers*, 637 F. Supp. 2d 166, 176-77 (S.D.N.Y. 2009)).

Consistent with these principles of equity, the Receiver proposes to distribute an estimated $13 million of available receivership assets *pro rata* to claimants with proposed Allowed Claims (defined below) totaling approximately $165.8 million. Assuming no material change to these estimates, such a distribution would afford claimants a recovery of approximately 7.8% of their Allowed Claim.

    **A.**    **The Receiver estimates that the receivership estate will have available assets of approximately $13 million to distribute to claimants.**

The Receiver has prepared a fund balance report summarizing the assets collected and the corresponding fees and expenses incurred by the receivership estate from inception of the receivership (September 27, 2012) through July 31, 2018, the most recent period for which complete financial results are available. A copy of the Fund Balance Report is attached as

Exhibit A. To date, the Receiver has collected assets totaling $30,083,837.31. Against such assets, over the nearly six-year period of this case that involved multiple legal proceedings in courts throughout the world, the receivership estate incurred administrative costs, including all professional fees and expenses, totaling $7,904,081.74. Such amounts include fees and expenses still subject to Court approval. In August 2018, the Receiver also funded the $9 million settlement payment under the Final Settlement Agreement thereby resolving the BVI Liquidators' claims to substantially all of the assets of the receivership. (Notice of Withdrawal [Dkt. #610].) Thus, the receivership estate presently holds net balances of $13,179,755.57 for distribution to approved claimants and any additional administrative expenses incurred after July 31, 2018.

    **B.    Having Reviewed 1100 Claims, the Receiver Has Identified Allowed Claims Totaling Approximately $165.8 Million.**

During late January and February 2016, the Receiver served notices that the Court had set a claims bar date and directed persons who wished to assert a claim to do so in writing together with documentary support. Where the Receiver had enough information to verify an investor's claims based on receivership records, the Receiver also included a proposed claim amount that it would deem an "Allowed Claim" unless the investor objected; correspondingly where the Receiver lacked sufficient information, the Receiver designated an Allowed Claim of $0.00, while affording claimants the opportunity to submit a written claim otherwise with supporting documentation for the Receiver to review. The Receiver served such notices on all persons for whom the Receiver had contact information either by electronic mail (if available), Federal Express, or U.S. Mail. The Receiver also posted the notice on its website and published the Court-approved "Publication Notice" in the Wall Street Journal, International Edition. At the Receiver's request and to provide all claimants maximum opportunity to provide any necessary

documentation or otherwise submit a claim, the Court extended the Claims Bar Date to July 29, 2016. (Order [Dkt. # 510].)

By the extended deadline, excluding the BVI Liquidators' now resolved claims, the Receiver had identified, or claimants had otherwise submitted, a total of 1100 claims. The Receiver has assigned each of those claims a unique claim identification number or "Claim ID." In the attached Exhibit B, the Receiver has scheduled all claims, listing the corresponding (a) Claim ID, (b) claimant name, and (c) the amount the Receiver deemed to be an "Approved Claim." To preserve claimants' confidentiality, the Receiver has redacted each claimant's name from the publicly filed version of this Distribution Motion and is simultaneously seeking leave to file an unredacted copy of Exhibit B under seal.

Certain investors' claims listed in Exhibit B arose because of investments they made through Maven Assurance Ltd. and Maven Life International Ltd. (collectively, the "Maven Companies") who in turn fed such investments into the PIWM Portfolios. Those claims are denoted in Exhibit B by an asterisk next to the Allowed Claim amount (collectively, the "Maven Investor Claims"). After the Maven Companies were placed into liquidation, Anguilla courts appointed independent Cayman Island-based professionals (the "Maven Liquidators") to administer the Maven Companies' joint liquidation. Rather than adopting competing views as to the treatment of investor claims, as had been the case with the BVI Liquidators, the Receiver and the Maven Liquidators generally agreed that a *pro rata* distribution to all Battoo's victims was appropriate. Accordingly, the Maven Liquidators and the Receiver have cooperatively verified Maven Investor Claims, including communicating with investors regarding their claims through jointly issued letters. The receivership estate has benefited significantly from such cooperation. Among other things, the Maven Liquidators have been instrumental in leveraging their access to

the Maven Companies' books and records to more efficiently and accurately verify investor claims. As part of its cooperation with the Maven Liquidators, the Receiver will pay the total amount of allowed Maven Investor Claims to the Maven Liquidators to be finally administered as part of that estate. The Maven Liquidators in turn have indicated that such investors will be entitled to allowed claims in those proceedings of at least the amount such investors would have here.

In a separate motion filed concurrently, the Receiver seeks approval of procedures for providing notice of this Distribution Motion to all claimants and establishing objection deadlines. In conjunction with providing such notice, the Receiver proposes to provide each claimant with their corresponding Claim ID to allow them to look-up the amount of their Allowed Claim as determined by the Receiver. In doing so, claimants are provided a final opportunity to raise any outstanding objections, by the set deadline, that they may believe are unresolved. Affording such opportunity extends every accommodation to investors while nevertheless setting a definitive deadline to enable the Receiver to wind-down the receivership and distribute payments to investors. Indeed, claimants are best situated to evaluate whether the amount of the proposed Allowed Claim and strength of any objection they may wish to assert warrants further litigation expenses given the likely fractional recoveries.

In the aggregate, the Receiver has proposed Approved Claims totaling $165,754,443.69. In limited instances, the Receiver is continuing to work with a handful of claimants to finalize their respective claim amounts. While the Receiver does not expect any further changes to the amounts of Approved Claims listed in Exhibit B, should the Receiver subsequently determine revisions to be warranted, the Receiver will file a supplemental schedule identifying any such changes. Given the size of total Allowed Claims, the Receiver anticipates that such changes, if

any, will have a negligible effect on total claim amounts. Therefore, the Receiver believes that the estimated recoveries presented here provide a reliable, but not guaranteed, basis for assessing a claimant's likely recovery under the Receiver's proposed plan of distribution.

### C. The Receiver proposes to equitably distribute Available Assets on a *pro rata* basis to eligible investors in both the BVI Funds and PIWM Portfolios.

The Receiver proposes to distribute net receivership assets, *i.e.* total assets less approved administrative costs ("Available Assets"), on a *pro rata* basis. Because total Allowed Claims far exceed Available Assets, under the Receiver's proposed plan, each claimant will receive a payment equal to the amount of their Allowed Claim multiplied by the ratio of Available Assets divided by total Allowed Claims.

Given the extensive commingling of assets and Battoo's operation of the BC Common Enterprise as "one investment pool on a commingled basis," the Receiver proposes distributing available receivership assets to investors in both the PIWM Portfolios and the BVI Funds. Notwithstanding the foregoing and exercising its discretion under the terms of the Final Settlement Agreement with the BVI Liquidators, the Receiver proposes to exclude claims asserted by investors in the BVI Funds who the Receiver understands will likely receive substantial distributions through the BVI liquidation proceedings. (*See* Ex. B Claim #782.)

As described above, the Receiver estimates that there will be approximately $13 million in Available Assets and total Allowed Claims of approximately $165.8 million. Therefore, the Receiver estimates that claimants will receive a payment of just over 7.8% of their Allowed Claim, *i.e.* $13 million of Available Assets divided by $165.8 million of total Allowed Claims. Of course, the foregoing estimates are subject to change. For example, after resolving any objections that may be filed in response to this Distribution Motion, final total Approved Claims may be higher than the Receiver now anticipates, which would in turn cause individual

14

claimants' recovery percentage to decrease. Likewise, if the receivership estate incurs unexpectedly higher administrative costs, such as from extended litigation of objections to this Distribution Motion or over the treatment of any claims, there would be fewer Available Assets correspondingly decreasing investor recoveries.

> **D. The Receiver anticipates distributing assets as soon as practical after the Court approves a final plan of distribution and treatment of claims.**

Other than a handful of administrative tasks, the Receiver expects that distributing receivership assets to claimants will be the final substantive task in administering the receivership estate. Accordingly, the Receiver is preparing to distribute receivership assets to claimants as soon as practical following entry of an order approving a plan of distribution and final treatment of claims. The Receiver expects to make transfers to claimants located outside of the United States via wire transfer while paying claimants within the United States through a cashier's check. Again, the Receiver will pay the Maven Investor Claims directly to the Maven Liquidators for final administration. To prepare for making the forgoing payments, the Receiver will contact claimants with Allowed Claims to gather the necessary contact and transfer information. At the time of distribution, the Receiver will hold back a small reserve based on its then estimate of any remaining costs associated with closing the receivership estate.

**WHEREFORE**, Robb Evans & Associates LLC as Receiver respectfully requests that the Court enter an order: (a) approving the Receiver's plan of distribution providing for payments to claimants in an amount equal to each claimant's Allowed Claim multiplied by the ratio of Available Assets divided by the sum of all Allowed Claims; (b) approving on a final basis the Allowed Claim amounts scheduled in Exhibit B of the Distribution Motion; (c) authorizing and directing the Receiver to pay the approved amounts from receivership assets, including paying amounts due on account of the Maven Investor Claims to the Maven Liquidator

15

for final administration; (d) authorizing the Receiver to hold back a small reserve based on any then anticipated costs to close the receivership estate, and (e) granting the Receiver such other relief as the Court deems just and appropriate.

Dated: September 7, 2018

Respectfully submitted,

ROBB EVANS & ASSOCIATES LLC, Receiver for Nikolai Simon Battoo, BC Capital Group S.A., BC Capital Group International Limited a/k/a BC Capital Group Limited a/k/a BC Capital Group Global, and BC Capital Group Holdings S.A.

By: /s/ Blair R. Zanzig
 (One of Its Attorneys)

Blair R. Zanzig (ARDC # 6273293)
**HILTZ & ZANZIG LLC**
53 West Jackson Blvd., Suite 205
Chicago, Illinois 60604
Telephone: 312.566.9008
Facsimile: 312.566.9015
bzanzig@hzlawgroup.com

*Counsel for Receiver*

## CERTIFICATE OF SERVICE

      I, Blair R. Zanzig, an attorney, hereby certify that, on the 7th day of September 2018, I caused a true and correct copy of the foregoing **Receiver's Motion to Approve Plan of Distribution and Treatment of Claims** to be served through the Court's Electronic Case Filing System on the following:

AUSA – Chicago, usailn.ecfausa@usdoj.gov
Amanda Leigh Burks, hayesdj@sec.gov, sikoraj@sec.gov, mitchelljd@sec.gov
Carlin R Metzger, cmetzger@cftc.gov, nhooper@cftc.gov

*Attorneys for the United States Commodity Futures Trading Commission*

Alexander S. Lorenzo, alexander.lorenzo@alston.com
Anthony George Stamato, anthony.stamato@heitman.com
Emily L Seymore, emilyseymore@paulhastings.com, toyagarcia@paulhastings.com
William S. Sugden, will.sugden@alston.com

*Attorneys for Hadley J. Chilton and John J. Greenwood, in their capacity as Joint Liquidators*

Michael F. Cockson, jane.thompson@faegrebd.com, michael.cockson@faegrebd.com
Trina K Taylor, trina.taylor@faegrebd.com, faegrebddocket@faegrebd.com, colleen.russell@faegrebd.com

*Attorneys for Whitebox Concentrated Convertible Arbitrage Fund, Ltd.*

James Arthur McGurk, james@jamesmcgurklaw.com

*Attorney for Collette Guerra*

Gary Owen Caris, gcaris@diamondmccarthy.com

*Attorney for Receiver Robb Evans & Associates LLC*

                                                                                 /s/ Blair R. Zanzig